GEATHERS, J.:
*352 **502 In this action alleging violation of the Interstate Land Sales Full Disclosure Act (ILSA), 42 U.S.C. §§ 1701 to -1720 (1994), Appellants, The I'On Company, LLC, The I'On Club, LLC, The I'On Group, LLC f/k/a Civitas, LLC, and I'On Realty, LLC, seek review of the circuit court's orders (1) denying their motion for a judgment notwithstanding the verdict (JNOV) or new trial absolute and new trial nisi remittitur, (2) declaring a recreational easement invalid, (3) denying their motion for attorney's fees against Respondent Lea Ann Adkins, and (4) granting attorney's fees to Respondent Brad J. Walbeck.
Appellants argue (1) Walbeck and Adkins could not pursue this action as a derivative action; (2) Respondents' claims are barred by the statute of limitations; (3) the disputed recreational easement was valid and perpetual; (4) there was no fiduciary duty to convey certain amenities to the homeowners association, Respondent I'On Assembly, Inc.; (5) the directed verdict on Appellants' abuse of process counterclaim was improper; (6) Appellants were entitled to attorney's fees as the prevailing party on Adkins' breach of contract claim; (7) the attorney's fees award to Walbeck was unreasonable because he was awarded merely nominal damages on his ILSA claim; (8) the circuit court's ruling that Appellants were amalgamated was improper; and (9) Walbeck failed to show he relied on any representation made by Appellants and, therefore, he failed to establish a claim under ILSA.
We affirm in part, reverse in part, and remand for a new trial on Walbeck's breach of contract claim and the dismissal of all other claims.
FACTS/PROCEDURAL HISTORY
At the heart of this convoluted case is a developer's promise to convey certain amenities in a residential community to a homeowner's association. Specifically, Respondents allege that Appellants promised they would convey to Respondent I'On Assembly, Inc. (the HOA) the Community Dock and Creekside **503 Park located on the civic lot on which the boat ramp was located (lot CV-6) in I'On Village but instead sold these amenities to a third party. Appellants, however, allege they promised to convey a "generic" community dock and creekside park to the HOA but not the specific ones located on lot CV-6. Appellants also allege they conveyed the amenities as promised.
I'On Village is located in Mount Pleasant. It was conceived by Thomas Graham and his son, Vince Graham. Thomas Graham's company, Graham Development, was the original majority owner of the I'On Company, LLC (the I'On Company), and Vince Graham was the company's manager. The I'On Company's subsidiary, I'On Realty, LLC (I'On Realty), employed real estate agents to market the lots in I'On Village.
On November 27, 1999, Walbeck entered into a contract to purchase a lot in I'On Village. Walbeck's purchase contract incorporated a property report (the 1998 Property Report) that the I'On Company had filed with the United States Department of Housing and Urban Development (HUD) on November 3, 1998, pursuant to ILSA.[1] The report set forth information deemed necessary to protect prospective purchasers, including the amenities that would be provided to lot owners.
Specifically, the report included a chart listing amenities to be built during the first two phases of the development. Among the amenities to be built in Phase II was a "Creekside Park" and a "Community Dock." Under this listing was the following language:
The recreational facilities listed in the chart above shall, upon completion of construction, be conveyed to the [HOA] by quitclaim deed free and clear of all monetary liens and encumbrances at no cost to the [HOA] or its members. Upon conveyance of these facilities to the [HOA], it shall assume full responsibility for the costs of ownership, operation, and maintenance of the facilities conveyed to it.
*353 The report also included the following notification:
**504 VARIOUS RECREATIONAL FACILITIES IN THE SUBDIVISION MAY BE OWNED AND OPERATED BY PERSONS OTHER THAN THE [HOA]. THERE IS NO GUARANTEE THAT ANY SUCH FACILITIES WILL BE AVAILABLE FOR USE BY LOT OWNERS. ANY, OR ALL OF SUCH FACILITIES MAY BE OPERATED AS A PRIVATE CLUB FOR MEMBERS AND THEIR GUESTS. THERE IS NO ASSURANCE THAT YOU WILL BE ACCEPTED FOR MEMBERSHIP IN ANY SUCH PRIVATE CLUB IF YOU APPLY. IF ACCEPTED, THE COSTS OF SUCH A MEMBERSHIP MAY BE SUBSTANTIAL AND ARE IN ADDITION TO THE PURCHASE PRICE OF YOUR LOT. NO REFUND OF THE PURCHASE PRICE OF YOUR LOT WILL BE MADE IF YOU CANNOT OBTAIN A MEMBERSHIP. SINCE THE VALUE OF YOUR LOT MAY BE ADVERSELY AFFECTED BY YOUR INABILITY OR FAILURE TO OBTAIN A MEMBERSHIP, YOU SHOULD CAREFULLY CONSIDER YOUR PURCHASE OF A LOT IF IT IS BASED UPON YOUR PRESUMED ABILITY TO OBTAIN A MEMBERSHIP IN ANY PRIVATE CLUB AND TO USE ITS RECREATIONAL FACILITIES.
Throughout the years after Walbeck received the 1998 Property Report, Appellants built multiple community docks and parks in I'On Village. Nonetheless, Respondents considered and expected the Community Dock and Creekside Park listed in the 1998 Property Report to be located on lot CV-6-this lot had at least 300 feet of deep water access to Hobcaw Creek. The I'On Company also completed construction of a building on lot CV-6 that became known as the "Creek Club." The Creek Club was intended as a venue for wedding receptions and other events. It operated as a private club and hosted its first event circa 2003.
Appellants vacillated throughout the years concerning what they designated as the Community Dock and Creekside Park. At trial, Thomas Graham admitted that the Creek Club overlooked a park. He also admitted that when the I'On Company was planning its parks in 1999, the plans included "the Creek Club Park." In his deposition, Thomas Graham testified that the "Community Dock" listed in the 1998 Property Report **505 referred to the main dock at the Creek Club that was adjacent to the boat ramp on lot CV-6; the boat ramp was built in 1999 or 2000, and the Creek Club dock was completed in 2000 or 2001.[2] However, at trial, Thomas Graham disputed that the "Community Dock" listed in the 1998 Property Report referred to the Creek Club dock. He explained the reference to a community dock in the 1998 Property Report "was to a generic community dock" and not to a specific property as Respondents contended. He stated, "[T]his was before we had designed anything -- got anything permitted or approved, even bought the land .... We didn't know whether -- at that time, ... we thought sure we'd get one -- at least one community dock, but we didn't know how many, so that was a reference to that community dock."
On February 9, 2000, the I'On Club, LLC (the I'On Club) executed a "Recreational Easement and Agreement to Share Costs" (Recreational Easement) purporting to "provide access to the [HOA] members for them to use the docks and the boating ramp" off lot CV-6.[3] The Recreational Easement also included language purporting to grant an easement to the I'On Club for use and access to certain common areas within I'On Village. On page three of the document, the easement is described as perpetual. However, section 4.2 of the Recreational Easement states that either party can terminate the easement after thirty years upon six months' notice. Thomas Graham described this language as a mistake because the I'On Club intended for the Recreational Easement to be permanent.
*354 Section 3.1 of the Recreational Easement required the HOA to pay assessments "to cover a share of the costs incurred by [the I'On Club] in maintaining, repairing, replacing, operating[,] and insuring the Boating Facilities." The Boating Facilities were identified as "certain recreational facilities, including a boat ramp and dock and a driveway and parking area to serve them."
**506 On April 10, 2000, the I'On Company completed an amended property report for filing with HUD (first amended Property Report). Whereas the 1998 Property Report listed a "Creekside Park" and a "Community Dock" among the amenities to be built in Phase II, the first amended Property Report's list substituted "Marshwalk (park)" for "Creekside Park" and "Community Dock s" for "Community Dock." (emphasis added). The first amended Property Report also changed the language regarding transfer of these amenities to the HOA-whereas the 1998 Property Report provided for transfer of the Creekside Park and Community Dock to the HOA, the first amended Property Report stated, "The recreational facilities listed in the chart above, other than the sidewalks and community dock, shall, upon completion of construction, be conveyed to [the HOA] by quitclaim deed free and clear of all monetary liens and encumbrances at no cost to [the HOA] or its members." (emphasis added).
Jo Anne Stubblefield, the I'On Company's attorney for ILSA compliance, explained the amendment to the Property Report this way:
[I]n early 2000[,] the decision was made to have the I'On Club own and maintain a parking area, boat ramp[,] and dock as part of the Club Facilities and grant an easement to the [HOA] for use of all of these facilities so that property owners would have the same use rights they would have had in the "community dock" referenced in the original Property Report, but in addition would have rights to use the parking area and boat ramp (which had not been mentioned in the original Property Report and which the property owners would otherwise have had no right to use unless they joined the Club). The Recreational Easement was drafted to create that easement and to provide for the [HOA] to contribute to the costs incurred by the Club in maintaining the boat dock, boat ramp, and parking area. Once that was finalized and recorded, we amended the HUD Property Report (effective April 2000) to reflect that ....
Thomas Graham testified that the name of the Creekside Park was changed to Marshwalk after the 1998 Property Report was provided to Walbeck to avoid confusion with a nearby neighborhood called "Creekside Park." He also testified that the Marshwalk was not on lot CV-6 or adjacent to **507 Hobcaw Creek but ran for over two miles along the marsh, which was adjacent to a tributary of Hobcaw Creek. Vince Graham also testified that the "Creekside Park" was actually the Marshwalk.
On August 15, 2000, the I'On Company conveyed ownership of lot CV-6, including the Creek Club and boat ramp, to the I'On Club. Appellants conveyed the Marshwalk park to the HOA on November 21, 2000. Vince Graham testified that the conveyance included "docks two and three."
In July 2008, Mike Russo with 148 Civitas, LLC (Russo) submitted a proposal to buy lot CV-6, together with overflow parking on an adjacent lot (CV-5). The proposal included a provision for transfer of the "boat docks" to the HOA. Subsequent communications between Appellants and Russo indicated an intent to ultimately convey ownership of the boat ramp and dock off lot CV-6 to the HOA. However, in November 2008, Russo and Appellants entered into an agreement that included the boat ramp and Community Dock in the transfer of lot CV-6 to Russo, which was concerning to HOA members. The then-current president of the HOA's Board of Trustees (Board), Bruce Kinney, contacted Thomas Graham regarding modifying the Recreational Easement to protect the HOA members. One of the modifications Kinney sought was making the easement perpetual. However, on January 5, 2009, Thomas Graham notified Chad Besenfelder that Appellants would not modify the Recreational Easement while the Creek Club was under contract for sale to Russo.
On March 11, 2009, Board President Kinney sent an e-mail to Thomas Graham indicating *355 the Board's discovery of the 1998 Property Report's representation that the Community Dock would be conveyed to the HOA. Kinney expressed the HOA's expectation that the Community Dock would be excluded from the sale to Russo. Kinney's e-mail also inquired about the 1998 Property Report's listing of the Creekside Park as an additional amenity to be conveyed to the HOA.
Later in March 2009, Russo advised Kinney that he was cancelling the purchase agreement, and subsequently, Thomas Graham advised Kinney that Besenfelder was working out details for transferring ownership of the Community Dock to the HOA. Likewise, Besenfelder advised the HOA's management **508 company that ownership of the Community Dock would be transferred to the HOA. However, by August 1, 2009, the HOA learned that Appellants and Russo had recently entered into a new contract for the sale of CV-6 to Russo, including the Creek Club, the boat ramp, and Community Dock.
On August 5, 2009, the I'On Club conveyed ownership of lot CV-6 to Russo in consideration of $1,400,000. On this same day, Thomas Graham, Vince Graham, and Geoff Graham conveyed ownership of lot CV-5 to Russo in consideration of $225,000.00.[4] The conveyance of lot CV-6 to Russo was expressly subject to the Recreational Easement, and the I'On Club executed a written assignment of its rights and obligations under the Recreational Easement to Russo.
On December 22, 2010, Walbeck filed his Complaint against Appellants and 148 Civitas, LLC, alleging causes of action for violation of ILSA, Breach of Contract, Breach of Fiduciary Duty, Fraud, Negligent Misrepresentation, Civil Conspiracy, violation of the South Carolina Unfair Trade Practices Act, Unjust Enrichment, Promissory Estoppel, "Veil Piercing/Alter Ego," and Tortious Interference with Contract. The complaint also alleged that Walbeck was bringing the action on behalf of himself and derivatively on the HOA's behalf. On March 8, 2011, Walbeck filed an Amended Complaint adding Mike Russo (in his individual capacity) and I'On Realty as defendants. Appellants filed a motion to dismiss Walbeck's action on May 27, 2011 pursuant to Rule 12(b)(6), SCRCP, asserting, inter alia , Walbeck's claims were barred by the statute of limitations and Walbeck failed to satisfy the pleading requirements of Rule 23(b)(1), SCRCP, for a derivative action.
On February 7, 2012, Walbeck filed a Second Amended Complaint and Lea Ann Adkins joined Walbeck as a plaintiff. Walbeck and Adkins also added the HOA as a defendant and added an allegation that Appellants were amalgamated. On March 15, 2012, the circuit court issued an order denying Appellants' Rule 12(b)(6) motion to dismiss. On January 2, 2014, Respondents filed a Third Amended Complaint adding a cause of action for Aiding and Abetting against Russo. On January 13, 2014, Russo entered into a settlement agreement with Respondents. The terms of the settlement included Russo's **509 sale of lot CV-6 to the HOA for $495,000 and the HOA's lease of the building, lawn, and three parking spaces back to Russo. The settlement terms also allowed the HOA access to the Creek Club for 13 dates per year and Russo's future conveyance of lot CV-5 to the HOA.
Subsequently, Respondents' action against Appellants proceeded to trial on January 14, 2014, but the action ended in a mistrial on January 17, 2014. On February 21, 2014, the HOA realigned its party status and adopted the other Respondents' claims set forth in the Third Amended Complaint. On May 12, 2014, Appellants filed a separate action against Respondents, seeking a declaration that the Recreational Easement was perpetual. The circuit court granted Appellants' motion to consolidate their action with the present action.
On June 16, 2014, Respondents filed their Fourth Amended Complaint reflecting the HOA's realignment as a plaintiff, Russo's dismissal from the action, and elimination of the claims for Tortious Interference and Aiding and Abetting. Exactly one year later, the circuit court issued an order declaring the Recreational Easement invalid and void ab initio because the I'On Club lacked title to lot *356 CV-6 at the time it executed the easement. The circuit court also concluded the easement was not perpetual but was limited to a term of thirty years.
The parties re-tried the case from July 28 through August 1, 2014. The jury returned verdicts for Walbeck on his claims for violation of ILSA ($1), Negligent Misrepresentation ($20,000), and Breach of Contract ($10,000) and for the HOA on its claims for Breach of Contract ($1,000,000), Breach of Fiduciary Duty ($1,750,000), and Negligent Misrepresentation ($1,000,000). The HOA elected to recover on its Breach of Fiduciary Duty claim, and Walbeck elected to recover on his Negligent Misrepresentation claim. The circuit court denied Appellants' motion for a JNOV or new trial absolute and new trial nisi remittitur. The circuit court also denied Appellants' motion for an award of attorney's fees against Adkins and awarded attorney's fees to Walbeck pursuant to ILSA. This appeal followed.
**510 ISSUES ON APPEAL
1. Did Respondents properly file the derivative claims on the HOA's behalf?
2. Did the circuit court err by denying Appellants' JNOV motion as to the HOA's breach of fiduciary duty claim?
3. Were Respondents' claims barred by the statute of limitations?
4. Did the circuit court err by directing a verdict for Respondents on Appellants' abuse of process counterclaim?
5. Did the circuit court err by declaring the Recreational Easement invalid?
6. Did the circuit court err by concluding that Appellants were amalgamated?
7. Did the circuit court err by awarding attorney's fees to Walbeck?
8. Did the circuit court err by denying Appellants' request for attorney's fees against Adkins on her breach of contract claim?
STANDARD OF REVIEW
"In ruling on directed verdict or JNOV motions, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions." Sabb v. S.C. State Univ. , 350 S.C. 416, 427, 567 S.E.2d 231, 236 (2002). "The trial court must deny the motions when the evidence yields more than one inference or its inference is in doubt." Id. The appellate court "will reverse the trial court's rulings on these motions only [when] there is no evidence to support the rulings or [when] the rulings are controlled by an error of law." Hinkle v. Nat'l Cas. Ins. Co. , 354 S.C. 92, 96, 579 S.E.2d 616, 618 (2003).
"When considering a JNOV, 'neither [an appellate] court, nor the trial court has authority to decide credibility issues or to resolve conflicts in the testimony or the evidence.' " Curcio v. Caterpillar, Inc. , 355 S.C. 316, 320, 585 S.E.2d 272, 274 (2003) (quoting **511 Reiland v. Southland Equip. Serv., Inc. , 330 S.C. 617, 634, 500 S.E.2d 145, 154 (Ct. App. 1998), abrogated on other grounds by Webb v. CSX Transp., Inc. , 364 S.C. 639, 653, 615 S.E.2d 440, 448 (2005) ). A "JNOV should not be granted unless only one reasonable inference can be drawn from the evidence." Reiland , 330 S.C. at 634, 500 S.E.2d at 154.
As to questions of law, this court's standard of review is de novo. Fesmire v. Digh , 385 S.C. 296, 302, 683 S.E.2d 803, 807 (Ct. App. 2009).
LAW/ANALYSIS
I. Derivative Action
Appellants argue the circuit court erred by concluding Walbeck and Adkins properly filed derivative claims against Appellants pursuant to Rule 23(b)(1), SCRCP. We agree.
Rule 23(b)(1) addresses the procedural requirements for individuals seeking to file a derivative action. It states,
In a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it, the complaint shall be verified and shall allege *357 that the plaintiff was a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law. The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort . The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association.
(emphases added). Further, the determination of whether a plaintiff has met the requirements of Rule 23 is limited to assessing the sufficiency of the allegations within the complaint. See McCormick v. England , 328 S.C. 627, 632-33, 494 S.E.2d 431, 433 (Ct. App. 1997) ("A ruling on a motion to **512 dismiss a claim must be based solely on the allegations set forth on the face of the complaint.").[5]
"The purpose of the demand requirement is to 'affor[d] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right.' " Kamen v. Kemper Fin. Servs., Inc. , 500 U.S. 90, 96, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) ) (alteration in original) (quoting Daily Income Fund, Inc. v. Fox , 464 U.S. 523, 533, 104 S.Ct. 831, 78 L.Ed.2d 645 (1984) ). "Thus, the demand requirement implements 'the basic principle of corporate governance that the decisions of a corporation-including the decision to initiate litigation-should be made by the board of directors or the majority of shareholders.' " Kamen , 500 U.S. at 101, 111 S.Ct. 1711 (quoting Daily Income Fund, 464 U.S. at 530, 104 S.Ct. 831 ).
Here, Respondents' pleadings fall short of alleging facts indicating either an adequate demand by Walbeck or Adkins directed to the Board or the futility of making such a demand. The pleadings allege that "[s]everal I'On homeowners" repeatedly demanded the Board "to secure [the HOA] and its members the rights to the Creekside Park and Community Dock," including "unencumbered title, access, and use of" these amenities. The pleadings also include allegations that Walbeck and Adkins directed a demand to Appellants to convey title to these amenities to the HOA. However, the pleadings do not allege that either Walbeck or Adkins directed a demand to the Board to initiate litigation against Appellants to enforce the HOA's alleged rights and recover the disputed amenities.
Further, the pleadings do not adequately allege facts indicating that a demand of the Board would have been futile. The pleadings allege that additional demands would be futile because the Board failed to timely act to protect the rights of the **513 HOA and its members and Appellants' conveyance of the Creekside Park and the Community Dock to Russo "evidences the Board's failure to secure the rights to" these amenities and "the futility of further demand." However, there are no allegations that a demand on the Board to initiate litigation to recover these amenities would have been futile. Further, there are no allegations that the non-developer members of the Board were guilty of some wrongdoing that would give them an incentive to automatically reject such a demand or that Appellants had veto power over the Board such that they would prevent the Board from initiating litigation against them.
Based on the foregoing, we reverse the circuit court's ruling that Walbeck and Adkins properly filed derivative claims on the HOA's behalf.[6] We order the circuit court to dismiss these claims.
*358 II. Fiduciary Duty
Even assuming the derivative claims were properly before the circuit court, we agree with Appellants that the circuit court erred in concluding Appellants had a fiduciary duty to convey title to the Creekside Park and Community Dock on lot CV-6 to the HOA.
Specifically, Appellants argue the circuit court erred in concluding that (1) a developer in control of a homeowners association may not make decisions that benefit the developer's own interest at the expense of the association and its members; and (2) a developer's failure to convey common areas to a homeowners association "is at least the equivalent of conveying them in 'substandard condition.' " As to the second conclusion, we agree that the circuit court erred. As both challenged conclusions concern questions of law, this court reviews them de novo. See **514 Hendricks v. Clemson Univ. , 353 S.C. 449, 456, 578 S.E.2d 711, 714 (2003) ("Whether the law recognizes a particular duty is an issue of law to be decided by the [c]ourt."); Fesmire , 385 S.C. at 302, 683 S.E.2d at 807 ("This [c]ourt reviews all questions of law de novo.").
Appellants maintain the circuit court confused the contractual duty to convey title allegedly created by the 1998 Property Report with a fiduciary duty to the HOA. "An affirmative legal duty exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance." Hendricks , 353 S.C. at 456, 578 S.E.2d at 714. "Ordinarily, the common law imposes no duty on a person to act. [When] an act is voluntarily undertaken , however, the actor assumes the duty to use due care." Id. at 456-57, 578 S.E.2d at 714 (emphasis added). Consistent with this proposition is this court's explanation of the foundation for a fiduciary duty: "A confidential or fiduciary relationship exists when one reposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence ." Goddard v. Fairways Development General Partnership , 310 S.C. 408, 414, 426 S.E.2d 828, 832 (Ct. App. 1993) (emphasis added) (quoting Island Car Wash, Inc. v. Norris , 292 S.C. 595, 599, 358 S.E.2d 150, 152 (Ct. App. 1987) ). "Courts of equity have been careful to define fiduciary relationships so as not to exclude new cases that may give rise to the relationship." Id.
In Goddard , this court compared the duty of a developer of a planned unit development (PUD) to its villa owners, prior to the formation of the villa owners association, to the duty of the promoters of a corporation: "Both are entrusted by interested investors to bring about a viable organization to serve a specific function. Both should be expected to use good judgment and act in utmost good faith to complete the formation of their organizations." 310 S.C. at 415, 426 S.E.2d at 832. The court found merit in the appellants' argument that the developer had a responsibility to ensure the common areas were in good repair when they were conveyed to the villa owners' association. Id. The court also recognized the evidence showing that the common areas were substandard when the developer turned them over to the association. Id.
**515 The court highlighted evidence that the developer "seized the opportunity ... to 'unload' the common areas on the [a]ssociation without a plan to establish a reserve or a plan to fund the [a]ssociation until such time as assessments were adequate to cover maintenance expenses." Id. The court stated, "It seems unfair to the villa owners for the [d]eveloper to burden them with substandard or deteriorated common areas that required an immediate expenditure of funds to bring them up to standard without a plan or a reserve fund to cover the expenditures." Id. In Concerned Dunes West Residents, Inc. v. Georgia-Pacific Corp. , our supreme court adopted this court's analysis in Goddard and held, "The developer of a PUD owes a duty to [a homeowners association] to turn over *359 common areas that are not substandard and that are in good repair. Failure to do so subjects the developer to liability for bringing the common areas up to standard." 349 S.C. 251, 256-57, 562 S.E.2d 633, 637 (2002).
Prior to recognizing the fiduciary duty a developer owes to homeowners as the development's promoter, the Goddard court addressed the appellants' argument that a fiduciary duty arose from the developer's control of the villa owners' association. 310 S.C. at 413, 426 S.E.2d at 831. Specifically, the villa owners asserted that the superior voting strength of the developer and its president created "a fiduciary obligation to assess the villa owners at a level necessary to maintain sufficient reserves to adequately maintain the common areas." Id. The court stated, "Assuming a fiduciary relationship exists between the appellants and respondents because of their superior voting power , it is clear that the respondents have refrained from exercising their superior voting strength to effectuate higher assessments in deference to the wishes of the appellants to keep the assessments low." Id. at 414, 426 S.E.2d at 832 (emphases added).
Thus, rather than rejecting the existence of a fiduciary relationship arising from the developer's superior voting power, the court declined to hold that the developer's assessment determinations violated a fiduciary duty to the villa owners. Id. The court merely invoked the business judgment rule, which implicitly recognizes the obligation of the directors of a homeowners association to act in good faith: "In a dispute between the directors of a homeowners association **516 and aggrieved homeowners, the conduct of the directors should be judged by the 'business judgment rule' and absent a showing of bad faith , dishonesty, or incompetence, the judgment of the directors will not be set aside by judicial action." Id. (emphasis added). This is compatible with the good faith requirement for fiduciaries: "A confidential or fiduciary relationship exists when one reposes a special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence." Id. (emphasis added) (quoting Island Car Wash, 292 S.C. at 599, 358 S.E.2d at 152 ). Therefore, we reject Appellants' argument that the business judgment rule precludes the existence of a fiduciary relationship between a developer in control of a homeowners association and the association's members.
Here, Appellants retained continuing control of the HOA up to and including the date they conveyed lot CV-6 to Russo. The Declaration of Covenants, Conditions, and Restrictions (Covenants) provided that the I'On Company, as Founder, had the authority to "appoint, remove[,] and replace the members of [the HOA's] Board of Trustees" for a limited period of time not to exceed twenty years after the Covenants' recording. The I'On Company also had the authority to
disapprove any action, policy[,] or program of the [HOA], the Board of Trustees, and any committee [that], in the sole judgment of the [I'On Company], would tend to impair rights of [the I'On Company] or Builders under [the Covenants] or the Bylaws, or interfere with development or construction of any portion of I'On, or diminish the level of services being provided by the [HOA].
(emphasis added). At trial, Thomas Graham testified that the I'On Company still retained these veto rights.
Appellants contend there were no developer-appointed directors serving on the HOA's Board after December 2005 and Appellants have never exercised any of the I'On Company's veto rights.[7] However, as in Goddard , Appellants' asserted **517 restraint does not speak to the existence of a fiduciary relationship and the duty to act in good faith arising from their veto power but rather to the manner in which they carried out such a duty. See id. (assuming arguendo the existence of a fiduciary relationship and declining to find a violation of a fiduciary duty by invoking the business judgment rule). Therefore, we reject Appellants' argument that their restraint *360 from exercising the veto power precludes the existence of a fiduciary relationship.
Rather, we define Appellants' fiduciary duty arising from its retention of control over the HOA by the standards set forth in Island Car Wash :
[A]nyone acting in a fiduciary relationship shall not be permitted to make use of that relationship to benefit his own personal interests. ... [C]ourts of equity will scrutinize with the most zealous vigilance transactions between parties occupying confidential relations toward each other and particularly any transaction between the parties by which the dominant party secures any profit or advantage at the expense of the person under his influence.
292 S.C. at 599, 358 S.E.2d at 152.
Based on the foregoing, the circuit court did not err in concluding that a developer in control of a homeowners association may not make decisions that benefit the developer's own interest at the expense of the association and its members. This deduction logically flows from the above standards set forth in Island Car Wash , Goddard , and our supreme court's decision in Concerned Dunes adopting Goddard 's analysis.
Nonetheless, the circuit court's denial of Appellants' JNOV motion was based on its extrapolation of a specific fiduciary duty to convey title to common areas from the duty pronounced in Goddard and Dunes West , i.e., the fiduciary duty to ensure common areas are in good repair before turning them over to a homeowners association. South Carolina precedent does not impose on developers a generic fiduciary duty to convey title to a subdivision's common areas to the homeowners association in every conceivable case. Rather, when reference to a particular subdivision's restrictive covenants resolves issues involving the common areas, those covenants control. See **518 Cedar Cove Homeowners Ass'n, Inc. v. DiPietro , 368 S.C. 254, 259, 628 S.E.2d 284, 286 (Ct. App. 2006) ("Where ... issues involving the common area of a subdivision-as raised by the pleadings-are resolved by reference to the applicable restrictive covenants, those covenants control."). Here, the Covenants' definition of "Commons" is "Real Property and interests therein [that] the [HOA] owns or otherwise holds possessory or use rights in for the common use and enjoyment of Titleholders."[8] (emphasis added). Therefore, the Covenants do not require the HOA to hold an ownership interest in a common area.
Further, and of critical import, the 1998 Property Report included language notifying prospective homeowners that certain amenities in I'On Village "may be owned and operated by persons other than the [HOA]." The notification emphasized that there was no guarantee a homeowner would have access to these amenities because they could be operated as a private club for its members and guests. This language placed prospective HOA members on notice that they would be buying into a community that would likely be shared with non-HOA members.
In sum, the record in this case does not support the conclusion that Appellants had a fiduciary duty to convey to the HOA those specific amenities associated with the Creek Club on lot CV-6. Therefore, the circuit court's conclusion that Appellants breached their fiduciary duty to the HOA's members by failing to convey title to the disputed amenities was controlled by an error of law. Accordingly, we reverse the denial of Appellants' JNOV motion as to this claim. See Hinkle , 354 S.C. at 96, 579 S.E.2d at 618 ("[The appellate court] will reverse the [circuit] court's rulings on [directed verdict and JNOV] motions only [when] there is no evidence to support the rulings or [when] the rulings are controlled by an error of law.").
III. Statute of Limitations
Appellants assert that Walbeck's claims are time-barred because they accrued before December 22, 2007, which was **519 exactly three years before Walbeck filed his initial complaint. With the exception of the breach of *361 contract claim,[9] we agree. Appellants also assert that the HOA's claims, assuming they meet the standards for derivative claims, are time-barred because they accrued before February 7, 2009, which was exactly three years before Walbeck and Adkins filed the Second Amended Complaint on the HOA's behalf. Walbeck first asserted derivative claims in his initial complaint, but their derivative nature was not reflected in the case caption until Walbeck filed the Second Amended Complaint. Nonetheless, the derivative claims, other than breach of contract, are time-barred even if they were first filed with Walbeck's initial complaint.
The three-year statute of limitations, section 15-3-530(5) of the South Carolina Code (2005),[10] applies to Respondents' negligent misrepresentation claims.[11] With the exception of medical malpractice actions, "all actions initiated under [s]ection 15-3-530(5) must be commenced within three years after the person knew or by the exercise of reasonable diligence should have known that he [or she] had a cause of action." S.C. Code Ann. § 15-3-535 (2005) (emphasis added). The "exercise of reasonable diligence" means "the injured party must act with some promptness [when] the facts and circumstances of an injury place a reasonable person of common knowledge and experience on notice that a claim against another party might exist." Dean v. Ruscon Corp. , 321 S.C. 360, 363-64, 468 S.E.2d 645, 647 (1996) (second emphasis **520 added). In other words, the discovery rule does not "require absolute certainty [that] a cause of action exists before the statute of limitations begins to run." Bayle v. S.C. Dep't of Transp. , 344 S.C. 115, 126, 542 S.E.2d 736, 741 (Ct. App. 2001).
The burden of establishing the bar of the statute of limitations rests upon the one interposing it, and when the testimony is conflicting upon the question, it becomes an issue for the jury to decide. However, when there is no conflicting evidence or only one reasonable inference can be drawn from the evidence, the determination of when a party knew or should have known that he or she had a claim becomes a matter of law to be decided by the trial court .
Turner v. Milliman , 381 S.C. 101, 110, 671 S.E.2d 636, 641 (Ct. App. 2009) (emphases added) (citation omitted), aff'd in part, rev'd in part on other grounds , 392 S.C. 116, 708 S.E.2d 766 (2011).
The statute of limitations for the ILSA claim is "three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence ." 15 U.S.C. § 1711(a)(2) (emphasis added). There is a dearth of published case law interpreting this provision, but the opinion in Streambend Properties III, LLC v. Sexton Lofts, LLC , 297 F.R.D. 349, 359 (D. Minn.), aff'd , 587 F. App'x 350 (8th Cir. 2014), indicates an interpretation similar to Dean 's interpretation of the identical standard in section 15-3-535, i.e., "three years after the person knew or by the exercise of reasonable diligence should have known that he [or she] had a cause of action." (emphasis added).
In the present case, the jury found the date that Respondents knew or should have known they had claims against Appellants was August 5, 2009, the date Appellants sold the disputed amenities to Russo. However, Appellants argue the initial representation on which Respondents claim they relied was that Appellants would convey the disputed amenities to the HOA free of charge upon completion of construction, and Respondents knew or should have known upon completion *362 of construction in early 2001 that they did not receive such a conveyance.[12] Therefore, at that time, Respondents knew or **521 should have known they might have claims against Appellants. The logical extension of this argument is that Walbeck, in his individual capacity and as a representative of the HOA, certainly should have known before December 22, 2007, approximately six years after the completion of construction, that he and the HOA had claims against Appellants.
Even viewing the evidence in the light most favorable to Respondents, we agree with Appellants that the negligent misrepresentation and ILSA claims accrued well before December 22, 2007. We base our determination of each claim's accrual on the particular claim's allegations concerning breach of duty.
Negligent Misrepresentation
As to the negligent misrepresentation claims, Respondents alleged:
88. The I'On Defendants made oral and written representations that the Community Dock and Creekside Park would be transferred to the [HOA].
...
90. The Defendants owed a duty of care to the Plaintiffs to communicate truthfully all information regarding [their] purchase in I'On , without material omission.
91. The Defendants[ ] breached that duty owed by misrepresenting facts [that], in conjunction with other representations, induced the Plaintiffs and other lot purchasers to enter into contracts for the purchase of lots in I'On.
92. The Plaintiffs, the [HOA], and its members have suffered a pecuniary loss as a direct and proximate result of [their] reliance on the Defendants' false representations.
(emphases added). Paragraph 88 referred to the representation made in the 1998 Property Report. Paragraph 91 designates **522 the breach of Appellants' duty of care as misrepresenting facts that induced Walbeck to purchase his lot.
Thus, as to the negligent misrepresentation claims, the question is when Walbeck, in his individual and representative capacity, knew or should have known that the representation purportedly inducing him and other HOA members to buy their lots, i.e., the statement in the 1998 Property Report indicating that title to certain amenities would be conveyed to the HOA upon completion of construction , was unfulfilled. By April 10, 2001, Appellants completed construction of the Community Dock and Creekside Park. By early November 2004, when Walbeck received information indicating the HOA might not own the Community Dock or Creekside Park, Walbeck should have known that the statement indicating title to these amenities would be conveyed upon completion of construction was unfulfilled. See Dean , 321 S.C. at 363-64, 468 S.E.2d at 647 (stating that the "exercise of reasonable diligence" means "the injured party must act with some promptness [when] the facts and circumstances of an injury place a reasonable person of common knowledge and experience on notice that a claim against another party might exist" (second emphasis added)); Bayle , 344 S.C. at 126, 542 S.E.2d at 741 (stating that the discovery rule does not "require absolute certainty a cause of action exists before the statute of limitations begins to run").
Walbeck admitted receiving copies of the HOA's proposed annual budgets, which began including a "Creek Club Dock usage Fee" as early as October 10, 2004, for the 2005 budget year, if not earlier. The proposed 2005 budget was mailed to HOA members on November 1, 2004. The listing of a fee being paid by the HOA for use of the Community Dock should have alerted Walbeck to the fact that the HOA might not have title to the Community Dock or the other *363 amenities listed in the 1998 Property Report, such as Creekside Park. He could have deduced from this budget item alone that the statement indicating title to these amenities would be conveyed upon completion of construction was unfulfilled. Hence, Respondents' negligent misrepresentation claims accrued no later than early November 2004 and expired no later than early November 2007. **523 Therefore, the only reasonable inference that can be drawn from the evidence is that Respondents' negligent misrepresentation claims accrued well before December 22, 2007. See § 15-3-535 (stating that with the exception of medical malpractice actions, "all actions initiated under Section 15-3-530(5) must be commenced within three years after the person knew or by the exercise of reasonable diligence should have known that he had a cause of action." (emphasis added)); Turner , 381 S.C. at 110, 671 S.E.2d at 641 ("[W]hen there is no conflicting evidence or only one reasonable inference can be drawn from the evidence, the determination of when a party knew or should have known that he or she had a claim becomes a matter of law to be decided by the trial court.").
In its order denying Appellants' JNOV motion, the circuit court concluded that even if the date Respondents should have discovered their claims preceded the three-year limitations period, equitable estoppel would have served to toll the statute of limitations.
A defendant will be estopped to assert the statute of limitations in bar of a plaintiff's claim when the delay that otherwise would give operation to the statute has been induced by the defendant's conduct.
The doctrine is, of course, most clearly applicable [when] the aggrieved party's delay in bringing suit was caused by his opponent's intentional misrepresentation; but deceit is not an essential element of estoppel. It is sufficient that the aggrieved party reasonably relied on the words and conduct of the person to be estopped in allowing the limitations period to expire.
The conduct may involve either inducing the plaintiff to believe that an amicable adjustment of the claim will be made without suit or inducing the plaintiff in some other way to forbear exercising his right to sue.
Magnolia N. Prop. Owners' Ass'n, Inc. v. Heritage Communities, Inc. , 397 S.C. 348, 372-73, 725 S.E.2d 112, 125-26 (Ct. App. 2012) (quoting Dillon Cnty. Sch. Dist. No. Two v. Lewis Sheet Metal Works, Inc., 286 S.C. 207, 218-19, 332 S.E.2d 555, 561 (Ct.App.1985), overruled on other grounds by Atlas Food Sys. & Serv., Inc. v. Crane Nat'l Vendors Div. of Unidynamics Corp. , 319 S.C. 556, 462 S.E.2d 858 (1995) ). Here, Walbeck **524 has not presented evidence showing that he reasonably relied on the words or conduct of any representative of Appellants in allowing the limitations period for Respondents' negligent misrepresentation claims to expire in early November 2007. Therefore, the doctrine of equitable estoppel is not availing to Respondents.
The circuit court also stated that it was "concerned with the existence of any evidence supporting the jury's findings and ha[d] no authority to resolve conflicts purportedly created by the jury's disregard of other evidence," citing Curcio as supporting authority. See Curcio , 355 S.C. at 320, 585 S.E.2d at 274 ("When considering a JNOV, 'neither [an appellate] court, nor the trial court has authority to decide credibility issues or to resolve conflicts in the testimony or the evidence.' " (quoting Reiland , 330 S.C. at 634, 500 S.E.2d at 154 )). However, in the present case, there was only one reasonable inference from the evidence as to when Walbeck should have known Respondents might have claims against Appellants for the representation in the 1998 Property Report. Therefore, this question was one of law to be decided by the circuit court. See Turner , 381 S.C. at 110, 671 S.E.2d at 641 ("[W]hen there is no conflicting evidence or only one reasonable inference can be drawn from the evidence, the determination of when a party knew or should have known that he or she had a claim becomes a matter of law to be decided by the trial court.").
Based on the foregoing, Respondents' negligent misrepresentation claims accrued well before December 22, 2007, as a matter of law, and therefore, the circuit court erred in submitting this question to the jury. Because *364 Walbeck failed to file the Complaint until December 22, 2010, Respondents' negligent misrepresentation claims are barred by the statute of limitations. Accordingly, we reverse the denial of Appellants' JNOV motion as to these claims.
ILSA
In the ILSA claim, Respondents alleged:
60. Defendants have violated [ILSA] by: (1) issuing a Property Report that made representations to prospective purchasers of lots that were false; ... (2) continually distributing copies of the Property Report to potential purchasers, with knowledge that it contained false representations and **525 that these representations would likely be relied upon, and were in fact relied upon by numerous lot purchasers in I'On; [or] (3) failing to honor the representations therein.
Like the negligent misrepresentation claims, the question as to the ILSA claim is when Walbeck knew or should have known that the representation in the 1998 Property Report was unfulfilled. As we previously explained, the only reasonable inference from the evidence is that Walbeck should have known well before December 22, 2007, that the statement indicating title to the Community Dock and Creekside Park would be conveyed upon completion of construction was unfulfilled. Therefore, the circuit court erred in submitting this question to the jury. Accordingly, we reverse the denial of Appellants' JNOV motion as to this claim and order the circuit court to dismiss this claim as well as the negligent misrepresentation claims.[13]
IV. Abuse of Process
Pursuant to Rule 220(b), SCACR, and the following authorities, we affirm the denial of Appellants' JNOV motion as to their counterclaim for abuse of process: Pallares v. Seinar , 407 S.C. 359, 370-71, 756 S.E.2d 128, 133 (2014) (holding that the ulterior or improper purpose element of abuse of process "exists if the process is used to secure an objective that is 'not legitimate in the use of the process ' " (emphasis added) (quoting D.R. Horton, Inc. v. Wescott Land Co. , 398 S.C. 528, 551, 730 S.E.2d 340, 352 (Ct. App. 2012) )); Swicegood v. Lott , 379 S.C. 346, 353, 665 S.E.2d 211, 214 (Ct. App. 2008) ("The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself , such as the surrender of property or the payment of money, by the use of the process as a threat or club." (emphases added) (quoting Huggins v. Winn-Dixie Greenville, Inc. , 249 S.C. 206, 209, 153 S.E.2d 693, 694 (1967) )).
**526 V. Recreational Easement
Appellants maintain the circuit court erred in (1) finding that section 4.2 of the Recreational Easement limited the term of the easement to thirty years, superseding previous language stating the easement was perpetual, and (2) concluding that the Recreational Easement was invalid. However, Appellants did not appeal all of the grounds specifically listed by the circuit court to support its declaration of invalidity. Namely, they failed to challenge the circuit court's conclusion that the Recreational Easement was not an arms-length transaction. Therefore, this court will affirm the circuit court's declaration under the two-issue rule. See Jones v. Lott , 387 S.C. 339, 346, 692 S.E.2d 900, 903 (2010) ("Under the [two-issue] rule, [when] a decision is based on more than one ground, the appellate court will affirm unless the appellant appeals all grounds because the unappealed ground will become the law of the case."); id. , 692 S.E.2d at 903-04 (noting that the two-issue rule can be applied to situations not involving a jury); Anderson v. Short , 323 S.C. 522, 525, 476 S.E.2d 475, 477 (1996) (affirming the trial court's decision because the plaintiff did not appeal all grounds for the decision); see also *365 Atl. Coast Builders & Contractors, LLC v. Lewis , 398 S.C. 323, 329, 730 S.E.2d 282, 285 (2012) ("[A]n unappealed ruling, right or wrong, is the law of the case."); Jean Hoefer Toal, et al., Appellate Practice in South Carolina 214 (3rd ed. 2016) ("It is a fundamental rule of law that an appellate court will affirm a ruling by a lower court if the offended party does not challenge that ruling.").
In any event, we agree with the circuit court that the I'On Club's lack of title to lot CV-6 on the date the easement was executed was fatal to the easement's validity. Although Appellants argue they may rely on the doctrine of after-acquired property to ratify the Recreational Easement,[14] they do not cite any South Carolina authority for the proposition that this doctrine applies to the grant of an easement. Because **527 our supreme court has not spoken on this precise issue, we decline to apply this doctrine to the Recreational Easement. Therefore, we affirm the circuit court's conclusion that the Recreational Easement was invalid.
As we affirm the circuit court's declaration of invalidity, we need not address Appellants' challenge to the finding that the Recreational Easement was limited to a term of thirty years. See Futch , 335 S.C. at 613, 518 S.E.2d at 598 (providing that an appellate court need not address remaining issues when resolution of a prior issue is dispositive).
VI. Amalgamation
Appellants next argue the circuit court's ruling that Appellants were amalgamated was improper because the circuit court failed to consider the factors required by Sturkie v. Sifly , 280 S.C. 453, 313 S.E.2d 316 (Ct. App. 1984) for "piercing the corporate veil" to hold a corporation's principals personally liable for the corporation's wrongdoing.
Our supreme court recently examined the "amalgamation of interests theory" in Pertuis v. Front Roe Restaurants, Inc.[15] The court recognized this court's previous applications of the theory in Magnolia North Property Owners' Ass'n v. Heritage Communities, Inc.[16] and Kincaid v. Landing Development Corp.[17] as well as its own reference to the theory in Kennedy v. Columbia Lumber & Manufacturing Co.[18] In Magnolia , this court analyzed the relationship of the defendant corporations to their officers, directors, headquarters, employees, functions, written representations, and admissions of liability to determine whether there existed "an amalgamation of corporate interests, entities, and activities so as to blur the legal distinction between the corporations and their activities." 397 S.C. at 358-60, 725 S.E.2d at 117-18 (quoting Kincaid , 289 S.C. at 96, 344 S.E.2d at 874 ). We concluded the evidence **528 supported the trial court's ruling that the corporations were amalgamated. Id. at 360, 725 S.E.2d at 118.
In Pertuis , the court formally recognized the amalgamation of interests theory for the first time and indicated a preference for the term "single business enterprise theory." Id. at 655, 817 S.E.2d at 280. Notably, the court held, "the single business enterprise theory requires a showing of more than the various entities' operations are intertwined," as the theory had previously been applied by our courts. Id. Rather, "[c]ombining multiple corporate entities into a single business enterprise requires further evidence of bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions." Id. at 655, 817 S.E.2d at 281. In comparison, the Sturkie requirements for holding a corporation's principals personally liable for the corporation's wrongdoing are (1) the failure to observe corporate formalities and (2) "an element of injustice or fundamental unfairness if the" corporation's acts are "not regarded as the acts of" its principals.
*366 See Mid-S. Mgt. Co. v. Sherwood Dev. Corp. , 374 S.C. 588, 597-98, 649 S.E.2d 135, 140-41 (Ct. App. 2007) (explaining Sturkie 's "two-prong[ed] test to determine whether a corporate veil should be pierced").
Therefore, the requirements for the single business enterprise theory as adopted by our supreme court overlap with the Sturkie requirements for piercing the corporate veil. The single business enterprise theory does not require a showing of the corporate defendants' failure to observe corporate formalities. However, the theory dovetails with the second prong of the Sturkie test, i.e., an element of injustice or fundamental unfairness, to place accountability where it belongs.
Here, even though there is evidence showing the various entities' operations are intertwined, there is no evidence of "bad faith, abuse, fraud, wrongdoing, or injustice resulting from the blurring of the entities' legal distinctions." Pertuis , 423 S.C. at 655, 817 S.E.2d at 281 (emphasis added). Therefore, we reverse the circuit court's conclusion that Appellants were amalgamated.[19]
**529 Appellants seek the remedy of a new trial because the circuit court's ruling relieved Respondents of the burden of establishing liability as to each individual Appellant and likewise relieved the jury members from their responsibility to evaluate the liability of each individual Appellant. Appellants also assert that the circuit court's instruction to the jury that Appellants were amalgamated suggested that Appellants had engaged in misconduct and the resulting prejudice requires a new trial. We agree and order the circuit court to conduct a new trial on Walbeck's breach of contract claim.
VII. Attorney's Fees for Walbeck
We need not address Appellants' challenge to the amount of fees awarded to Walbeck pursuant to 15 U.S.C. § 1709(c) because his ILSA claim is barred by the statute of limitations and, thus, he may not recover attorney's fees under § 1709(c). We reverse the circuit court's award under this statute.
VIII. Attorney's Fees against Adkins
Appellants claim they were entitled to an award of attorney's fees against Adkins on her breach of contract claim because they were the prevailing party pursuant to the fee-shifting provision in Adkins' lot purchase agreement. We affirm the circuit court's order denying attorney's fees against Adkins.
Appellants sought an award of attorney's fees against Adkins pursuant to the following provision in her lot purchase agreement: "If either party requires services of an attorney to enforce obligations under this Agreement, the prevailing party shall be due from the non-prevailing party reasonable attorneys' fees, costs[,] and expenses actually incurred ." (emphases added). The circuit court based its denial of the requested award on two grounds: (1) Adkins prevailed on three of her derivative claims against Appellants and there was "no practical or legal way to separate the derivative verdicts from Adkins or to attribute them more to Walbeck[ ] just because he prevailed on his claim for personal damages and Adkins did not"; and (2) while Adkins did not prevail on her breach of contract claim, she prevailed as to Appellants' counterclaim for abuse of process, "resulting in a draw on the individual **530 claims." In light of our holding that the derivative claims were not properly filed, the first ground no longer serves as a valid basis for the circuit court's ruling. However, the second ground remains a valid basis for declining to rule in favor of Appellants as the "prevailing party."
Moreover, this court may affirm for any ground appearing in the record. Rule 220(c), SCACR. Here, Appellants' petition for attorney's fees does not indicate that the addition of Adkins as a plaintiff required any significant increase in the efforts of counsel to defend this case. While the petition requests one-half of the total fees and expenses incurred from the date of the Second Amended Complaint's filing through the end of trial, it does not state that a corresponding amount of time and expenses were actually generated from Adkins' breach of contract claim or *367 the addition of Adkins as a named plaintiff for the derivative claims. Further, counsel's attorney's fees affidavit is not in the record.
Based on the foregoing, Appellants have not shown that the amount of attorneys' fees and expenses they requested was either reasonable or actually incurred , as required by the fee-shifting provision in Adkins' lot purchase agreement. Therefore, we affirm the denial of Appellants' request for attorney's fees against Adkins.
CONCLUSION
We affirm the order declaring the Recreational Easement invalid and the order denying Appellants' request for attorney's fees against Adkins. We affirm in part and reverse in part the order denying Appellants' motion for a JNOV or new trial absolute and new trial nisi remittitur. We reverse the order granting attorney's fees to Walbeck. Finally, we remand for a new trial on Walbeck's breach of contract claim and the dismissal of all other claims.
AFFIRMED IN PART, REVERSED IN PART, and REMANDED.
LOCKEMY, C.J., and HUFF, J., concur.

See 42 U.S.C. § 1707 (setting forth requirements for the contents of a property report, relating to the lots in a subdivision, to be made available to the public).

Vince Graham testified that the dock was completed in late 2000 or early 2001, before the Certificate of Occupancy was issued for the Creek Club itself on April 10, 2001.

Curiously, the I'On Club did not obtain title to lot CV-6 until six months later.

Geoff is the son of Thomas and brother of Vince.

This court's opinion in Carolina First Corp. v. Whittle , 343 S.C. 176, 188, 539 S.E.2d 402, 409 (Ct. App. 2000), certiorari granted August 23, 2001, has been cited in all of the parties' appellate briefs. After our supreme court granted certiorari in Whittle , the parties settled the case and the court issued an order on January 10, 2003, stating that this court's opinion would "remain viable in result only." Therefore, we do not view Whittle as binding precedent.

As we base our holding on the failure to meet the demand requirement of Rule 23, we decline to address Appellants' argument that Walbeck and Adkins did not fairly and adequately represent the interests of other HOA members similarly situated in enforcing the HOA's rights. See Futch v. McAllister Towing of Georgetown, Inc. , 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing that an appellate court need not address remaining issues when resolution of a prior issue is dispositive).

Appellants admit that in 2014, the I'On Company appointed a Board member, Chad Besenfelder, but he was excluded from participating in "Board decisions that would potentially be adverse to the I'On Company."

"Titleholder" is defined in the Covenants as "one or more persons who hold record title to any Real Property in I'On, other than persons who hold an interest merely as security for the performance of an obligation."

Appellants do not dispute the applicability of the twenty-year statute of limitations to Respondents' breach of contract claims because Walbeck's contract to purchase his lot was a sealed instrument. See S.C. Code Ann. § 15-3-520 (2005) (providing for a twenty-year statute of limitations for actions on a sealed instrument).

Subsection 5 provides for a three-year limitation on "an action for assault, battery, or any injury to the person or rights of another, not arising on contract and not enumerated by law, and [medical malpractice actions]."

We decline to reach the question of when the breach of fiduciary duty claim accrued as we reverse the circuit court's ruling on the merits of this claim. See supra section II; Futch , 335 S.C. at 613, 518 S.E.2d at 598 (providing that an appellate court need not address remaining issues when resolution of a prior issue is dispositive).

The 1998 Property Report stated,
The recreational facilities listed in the chart above shall, upon completion of construction, be conveyed to the [HOA] by quitclaim deed free and clear of all monetary liens and encumbrances at no cost to the [HOA] or its members. Upon conveyance of these facilities to the [HOA], it shall assume full responsibility for the costs of ownership, operation, and maintenance of the facilities conveyed to it.
It is undisputed that construction of the Community Dock and Creekside Park was completed in early 2001, no later than April 10, 2001.

Because this holding is dispositive of Walbeck's ILSA claim, we decline to address Appellants' argument that Walbeck did not rely on any representations made in the 1998 Property Report. See Futch , 335 S.C. at 613, 518 S.E.2d at 598 (providing that an appellate court need not address remaining issues when resolution of a prior issue is dispositive).

See Richardson v. Atl. Coast Lumber Corp. , 93 S.C. 254, 75 S.E. 371, 372 (1912) ("[I]f a grantor conveys land, with the usual covenants of warranty, to which at that time he has no title, but afterwards acquires a title, he is estopped from claiming that he did not have title at the time of the sale; and the after-acquired title inures to the benefit of his grantee." (dictum )).

423 S.C. 640, 817 S.E.2d 273 (2018).

397 S.C. 348, 725 S.E.2d 112 (Ct. App. 2012).

289 S.C. 89, 344 S.E.2d 869 (Ct. App. 1986).

299 S.C. 335, 340-41, 384 S.E.2d 730, 734 (1989).

We acknowledge that the circuit court did not have the benefit of the Pertuis decision when it ruled on this issue.