# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| ANTHONY NIEVES, KRISTIN CUIFFO, DENNIS HUTH, PENNY HUTH, ANTHONY RAIA, PATRICIA LAVOOK, MARTIN MURDOCH and PAULA MURDOCH, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2019-0464-SG |
| INSIGHT BUILDING CO., LLC, DBA INSIGHT HOMES, 36 BUILDERS, INC. DBA INSIGHT HOMES, INC., INSIGHT HOMES, INC., HANDLER CORPORATION DBA HANDLER HOMES, SEVEN BRANCH, LLC, CANNON ROAD INVESTMENTS, LLC and INDIAN MISSION INVESTMENTS, LLC, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  May 19, 2020
Date Decided:  August 4, 2020

Julia B. Klein, of KLEIN, LLC, Wilmington, Delaware, *Attorney for Plaintiffs.*

Curtis J. Crowther and William E. Gamgort, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, *Attorneys for Defendants Handler Corporation dba Handler Homes, Seven Branch, LLC, Cannon Road Investments, LLC and Indian Mission Investments, LLC.*

Nicholas G. Kondraschow and William J. Rhodunda, Jr., of RHODUNDA, WILLIAMS & KONDRASCHOW, Wilmington, Delaware, *Attorneys for Insight*

*Building Co., LLC dba Insight Homes, 36 Builders, Inc. dba Insight Homes, Inc., and Insight Homes, Inc.*

GLASSCOCK, Vice Chancellor

Indian Mission Church was founded in 1881 by and to serve the Nanticoke Indian people of Sussex County.[1] As is typical in Sussex County, the church has lent its name to the crossroads at which the church building was constructed, and the surrounding area, as well.

Sussex County itself is a poorly-drained plain, with many wetlands, areas of saturated soils and pocosins.[2] It is kept farmable and habitable, in part, by a network of tax ditches and private drainage ditches that carry water, ultimately, to nearby tidal creeks. The Indian Mission area of the County is no different. It lies in the drainage basin of the Hopkins Prong of Herring Creek, a tributary of Rehoboth Bay. Because of its low elevation and flat topography, the area draining to Herring Creek is prone to drainage problems. This case highlights one such; it is not the first over which I have presided.[3]

The drainage qualities of the Indian Mission area were of little moment prior to the last thirty years. Since then, however, the proximity of the locale to the area beaches have made it, while still rural in character, attractive to residential

---

[1] *See The Nanticoke Indian Tribe*, Indian Mission United Methodist Church, www.nanticokeindians.org/page/indian-mission-church.

[2] The "Delmarva (or Carolina) 'Bays.'" *See Robinson v. Oakwood Vill., LLC*, 2017 WL 1548549, at *1 (Del. Ch. Apr. 28, 2017). Pocosin itself is a Delaware Indian word meaning "upland swamp." *Pocosin*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/pocosin ("an upland swamp of the coastal plain of the southeastern U.S.").

[3] *See Robinson*, 2017 WL 1548549.

development. Any such development must consider storm run-off,[4] and comply with Delaware stormwater management law[5] and County drainage regulations.[6]

Perhaps one-half a mile south of Indian Mission crossroads lies a creek, Philips Branch, on the south side of which is a new large housing development called by its creators Stonewater Creek. This development is in the process of being completed. The Plaintiffs here are homeowners and residents of Stonewater Creek. Defendant Indian Mission Investments, LLC developed the property and Defendant Insight Homes, Inc. constructed the homes.[7] The Plaintiffs allege that the defective drainage system for Stonewater Creek, the improper construction and grading of their home sites, or a combination of the two, has led to numerous problems, for which they seek relief here.

The complaint describes those problems in colorful fashion. Generations of young congregants at the Indian Mission Church have no doubt learned about the seven plagues described in the biblical book of Exodus; if the complaint is true, conditions in Stonewater Creek rival those inflicted on those ancient Egyptians. The complaint[8] describes homes that are unlivable because infested with molds and

---

[4] *See generally id.*

[5] Notably, the Delaware Stormwater Management Act, 7 *Del. C.* § 4001 *et. seq.*

[6] *See* Sussex Cty. C. §§ 90-1 through 90-5.

[7] There are other entity Defendants, as described below.

[8] While I accept the allegations of the complaint as true for purposes of this pleadings-stage motion, they remain only that, allegations.

2

allergy-causing pests. Homes have been "covered by frogs," and those frogs have not been idle, because homesites are afflicted with schools of "frolic[some]" tadpoles. Swarms of mosquitos "transmit[]" "disease," and apparently attract "armies of spiders."[9]

The Plaintiffs seek an injunction forcing Indian Mission Investments, LLC and Insight Homes, Inc. to comply with the Delaware Stormwater Management Act to remedy these problems. They also seek damages under theories of negligence and breach of fiduciary duty, as well as breach of contract and warranty, and fraud.

The Defendants have moved to dismiss the equitable claims.[10] This Memorandum Opinion sets out my decision on those motions, below.

## I. BACKGROUND[11]

*A. The Parties*

Plaintiffs Anthony Nieves, Kristin Cuiffo, Dennis Huth, Penny Huth, Anthony Raia, Patricia Lavook, Martin Murdoch, and Paula Murdoch are residents of the Stonewater Creek development ("Stonewater Creek") in Sussex County.[12]

---

[9] Thus far, there are no reports of the stormwater run-off turning to blood.

[10] Insight Homes, Inc. has also moved to dismiss the Plaintiffs' claim for fraud.

[11] I draw all facts from the Plaintiffs' First Amended Complaint, Docket Item ("D.I.") 30 ("Am. Compl.") and documents incorporated therein. *See in re Morton's Rest. Grp., Inc. S'holder Litig.*, 74 A.3d 656, 658–59 (Del. Ch. 2013) (permitting consideration of documents incorporated into complaint in motion to dismiss). As discussed further below, all well-pled facts are considered true for the sake of this motion.

[12] Am. Compl., ¶¶ 1–8.

3

Defendant Insight Building Co., LLC dba Insight Homes is a Delaware limited liability company.[13]  36 Builders, Inc. dba Insight Homes, Inc. is a Delaware corporation.[14]  Insight Homes, Inc. is a Delaware corporation.[15]  I refer to Insight Building Co., LLC, 36 Builders, Inc., and Insight Homes, Inc. collectively as "Insight."

Defendant Handler Corporation dba Handler Homes ("Handler") is a Delaware corporation.[16]

Defendant Indian Mission Investments, LLC ("Indian Mission"), is a Delaware limited liability company.[17]

Non-parties Seven Branch, LLC ("Seven Branch") and Cannon Road Investments, LLC ("Cannon Road"), are Delaware limited liability companies that were formerly defendants but were voluntarily dismissed from this Action.[18]

---

[13] *Id.* ¶ 9.

[14] *Id.* ¶ 10.

[15] *Id.* ¶ 11.

[16] *Id.* ¶ 12.

[17] *Id.* ¶ 15.

[18] *Id.* ¶¶ 13–14; D.I. 63.

According to the First Amended Complaint (the "Amended Complaint"), Indian Mission conveyed the lots to Insight; Insight then built the houses and sold the lots to the Plaintiffs.[19]

*B. Factual Background*

1. <u>The Stonewater Creek Development and Handler's Relationship to Indian Mission</u>

Indian Mission developed the Stonewater Creek development, where the Plaintiffs reside.[20]    Handler, a builder and developer in Delaware, is Indian Mission's parent.[21]  Handler typically develops properties through affiliates such as Indian Mission.[22]  Normally, the assets of each Handler affiliate company are the plots that the affiliate develops.[23]  Thus, per the Amended Complaint, as plots sell, the assets held by the affiliate diminish.[24]  The affiliates, including Indian Mission, are bonded, but the bonds are posted to the Sussex Conservation District, and thus unavailable as a remedy to homeowners.[25]

---

[19] Am. Compl., ¶ 117 ("The lots on which Plaintiffs had their homes constructed all were conveyed to their homebuilder by Indian Mission."); *see id.* ¶ 59 ("Indian Mission retained ownership of the plots until a few months before Plaintiffs took possession of their respective homes.").

[20] *Id.* ¶¶ 28, 30.

[21] *Id.*

[22] *Id.* ¶ 28.

[23] *Id.* ¶ 36.

[24] *Id.*  The mechanism by which this "diminishes" the company's assets is not described in the Amended Complaint.  Presumably, lots are exchanged for cash, an asset.

[25] *Id.*

Handler personnel enact business for the affiliates. For example, Handler's Vice President, Robert Allen, Jr., is an "authorized signatory" for Indian Mission, and he has signed documents on behalf of Indian Mission.[26] Allen uses his Handler email when conducting business for Indian Mission.[27] Likewise, Handler's President, Mark Handler, conducts business on behalf of various Handler affiliates through his Handler email.[28] The Sussex Conservation District's only contact information for Stonewater Creek's developers are the Handler emails of Allen and Mark Handler.[29]

### 2. The Plaintiffs Contract with Insight to Build Their Homes in Stonewater Creek

Although Indian Mission developed the plots in Stonewater Creek, the Plaintiffs contracted with Insight to construct their homes and provide landscaping.[30] Insight offers prospective homeowners base models that the homeowners can then modify and upgrade.[31] Insight holds itself out as a premier energy efficient homebuilder.[32] As a part of its marketing plan, Insight offers an "extensive warranty

---

[26] *Id.* ¶¶ 31–32.

[27] *Id.* ¶ 32.

[28] *Id.* ¶ 33.

[29] *Id.* ¶ 34.

[30] *Id.* ¶ 18.

[31] *Id.* ¶ 23.

[32] *Id.* ¶¶ 24–27.

program" that includes, among other things, warranties related to the grading around the homes, settling around the foundation, drainage, and swales.[33] The Plaintiffs allege that these marketing campaigns, in part, induced each of them to select Insight as their homebuilder.[34]

On October 21, 2018, Plaintiffs Nieves and Cuiffo (together, the "Nieveses") signed a contract for Insight to build their home in Stonewater Creek.[35] The Nieveses closed on the home in March 2019.[36] A home inspection commissioned after the closing revealed "numerous structural defects," most having to do with mold and drainage.[37] When the Nieveses informed Insight about the mold, Insight sponsored and participated in a mold remediation, which the Nieveses found inadequate.[38] The Nieveses then allege they discovered improper grading, swales, and drainage on their lot and surrounding lots that created severe water problems that attracted pests and caused Cuiffo to have allergic reactions.[39]

---

[33] *Id.* ¶¶ 19–20.

[34] *Id.* ¶ 22.

[35] *Id.* ¶ 37.

[36] *Id.* ¶ 38.

[37] *Id.* ¶ 39.

[38] *Id.* ¶¶ 40–43.

[39] *Id.* ¶¶ 44–47.

## 3. The Stormwater Management System and Related Problems

In developed areas of the County, stormwater management systems control stormwater runoff.[40] Delaware enacted Chapter 40, Title 7 of the Delaware Code (the "Stormwater Management Act" or the "Act") to require any "person" who engages in "land disturbing activities" to submit "a sediment and stormwater management plan . . . and obtain[] a permit to proceed."[41] Land disturbing activities requiring such a permit include:

> any land change or construction activity for residential, commercial, industrial, or institutional land use which may result in soil erosion from water or wind or movement of sediments or pollutants into state waters or onto lands in the State, or which may result in accelerated stormwater runoff, including clearing, grading, excavating, transporting, and filling of land.[42]

Sussex County, based on authority from the Act, enacted the Sediment Control and Stormwater Management Ordinance of Sussex County, Delaware (the "Stormwater Ordinance") in the Sussex County Code to protect public health and the environment.[43] The Stormwater Ordinance provides Sussex County with the power to withhold building permits until the Sussex Conservation District approves a stormwater management plan.[44] The Sussex Conservation District, in turn, has

---

[40] *Id.* ¶ 48.

[41] *Id.*; 7 *Del. C.* § 4003(a).

[42] Am. Compl., ¶ 49; 7 *Del. C.* § 4002(4).

[43] Am. Compl., ¶ 50; Sussex Cty. C. §§ 90-1 through 90-2.

[44] Am. Compl., ¶ 51; Sussex Cty. C. §§ 90-1 through 90-5.

authority to request suspension or revocation of building permits in the case of absent or inadequate stormwater management plans.[45] Sussex County amended the Stormwater Ordinance in 2017 to provide "technical drainage and grading requirements."[46]

Stonewater Creek has been developed in several "phases." Prior to the construction of any homes in the relevant phase—"Phase 5.3"—Indian Mission submitted a stormwater management plan for Phase 5.3 (the "Stormwater Management Plan") to Sussex County.[47] According to the Plaintiffs, the Stormwater Management Plan failed to account for the construction of any future homes; in other words, it provided for adequate stormwater runoff *only* for the development free of houses.[48] In addition, the Plaintiffs allege that Indian Mission's actual development of the plots did not conform to its own Stormwater Management Plan, and that both Indian Mission and Insight foresaw problems with drainage.[49]

Indian Mission maintained ownership of the Plaintiffs' plots "until a few months before Plaintiffs took possession of their respective homes."[50] Although

---

[45] Sussex Cty. C. §§ 90-1 through 90-6; Am. Compl., ¶ 52.

[46] Sussex Cty. Ordinance No. 2489 (March 28, 2017), at 1; Am. Compl., ¶ 53.

[47] Am. Compl., ¶ 54.

[48] *Id.* ¶¶ 54–56.

[49] *Id.* ¶ 57.

[50] *Id.* ¶¶ 58–59. As noted, it appears from the Amended Complaint that Indian Mission sold the lots to Insight, who then built the homes and sold the lots to the Plaintiffs. *Id.* ¶ 117 ("The lots on

9

Indian Mission remains responsible for the engineering of a surface water runoff system, it delegated final work on that system to Insight.[51] The Plaintiffs allege that Insight then conducted the work without the required oversight from Sussex County or the Delaware Department of Natural Resources and Environmental Control (DNREC).[52] The Plaintiffs allege, supported by several examples, that the actual development of Phase 5.3 of Stonewater Creek was done out of sync not only with Indian Mission's own Stormwater Management Plan, but in violation of the requirements of the Stormwater Management Act, to disastrous results.[53] Specifically, the Plaintiffs allege that the grading on the lots is inconsistent with "the easement appearing thereon,"[54] that the Defendants used faulty construction with regard to the main infiltration ditches,[55] that swales fail to drain,[56] that the infiltration basin ditches and driveway pipes are improperly placed,[57] that the project lacked supervision by an engineer,[58] and that the Defendants' *ad hoc* remedies were

---

which Plaintiffs had their homes constructed all were conveyed to their homebuilder by Indian Mission.").

[51] *Id.* ¶ 60.

[52] *Id.*

[53] *Id.* ¶¶ 61–70.

[54] *Id.* ¶ 60

[55] *Id.* ¶ 62.

[56] *Id.* ¶ 63.

[57] *Id.* ¶ 64.

[58] *Id.* ¶ 66.

ineffective and insufficient.[59] Allegations of "homes overnight being covered by frogs," "frolicking tadpoles," "[d]isease-transmitting mosquitos" and "armies of spiders" populate the Amended Complaint.[60]

In March 2018, the Sussex Conservation District failed Stonewater Creek's storm management inspection and withheld further building permits as a result.[61] It issued permits again after Indian Mission promised to attempt remediation.[62] Remediation plans were delayed, or attempted and failed, until April 2019, when the Sussex Conservation District again withheld building permits as a result of the drainage problems.[63] In May 2019, Indian Mission met onsite in Stonewater Creek with engineers to discuss remediation.[64] The Sussex Conservation District released building permits on the day that remediation efforts began in July, but according to some residents, efforts were ineffective or aggravated the problem.[65]

The Plaintiffs allege, based on newspaper articles, Sussex County Council comments, a response from the Sussex Conservation District, resident complaints,

---

[59] *Id.* ¶ 65.

[60] *Id.* ¶¶ 61–70.

[61] *Id.* ¶ 71.

[62] *Id.*

[63] *Id.* ¶¶ 72–74.

[64] *Id.* ¶¶ 74–75.

[65] *Id.* ¶¶ 76–79.

and inspections failures that Indian Mission has been aware of the stormwater and drainage issues for years and has responded inadequately or ignored the problem.[66]

### 4. The Plaintiffs' Claims

In Counts I and II, the Plaintiffs seek injunctive relief against Indian Mission and Insight for breach of the Stormwater Management Act.[67] In Count III, the Plaintiffs seek a declaratory judgment that Indian Mission and Insight violated the Stormwater Management Act.[68] Count IV alleges a breach of fiduciary duty on the part of Indian Mission in its role as developer of Stonewater Creek.[69] Count V alleges negligence against Indian Mission and Insight for their roles in the development and construction of the Plaintiffs' homes.[70] In Count VI, the Plaintiffs seek to pierce the corporate veil and hold Handler liable for the actions of its affiliate, Indian Mission.[71] In Counts VII and VIII, the Plaintiffs allege breach of contract and implied warranties against Insight regarding its construction of their homes.[72]

---

[66] *See id.* ¶¶ 85–91.

[67] *Id.* ¶¶ 92–108. Count I was originally brought against Seven Branch and Cannon Road as well, the adjacent developers, but the claims against these two entities have been dismissed. D.I. 63.

[68] Am. Compl., ¶¶ 109–15.

[69] *Id.* ¶¶ 116–20.

[70] *Id.* ¶¶ 121–27. The Amended Complaint styles this as "Willful and Malicious Negligence," but the Plaintiffs' request for punitive damages was struck from the Amended Complaint on May 19, 2020. D.I. 63.

[71] Am. Compl., ¶¶ 128–37.

[72] *Id.* ¶¶ 138–54.

Count IX alleges negligent construction against Insight.[73]   The following Count, which is also labeled Count IX, but which I refer to as "alias Count X" for the sake of clarity, alleges fraudulent concealment and misrepresentation against Insight.[74]

### C. Procedural History

The Plaintiffs filed their Verified Complaint for Preliminary and Permanent Injunction, Declaratory Judgment, and Related Relief (the "Initial Complaint") on June 18, 2019.[75]   All Defendants moved to dismiss the Initial Complaint on July 9 and July 19, 2019.[76]   The Plaintiffs filed the Amended Complaint on September 2, 2019.[77]   Defendants Handler, Seven Branch, Cannon Road, and Indian Mission moved to dismiss the Amended Complaint and to strike the Plaintiffs' request for punitive damages on September 27, 2019 (the "Indian Mission Motion to

---

[73] *Id.* ¶¶ 155–60.

[74] *Id.* ¶¶ 161–65.

[75] Verified Compl. for Prelim. and Permanent Inj., Declaratory J., and Related Relief, D.I. 1.

[76] Def.' Seven Branch LLC, Handler Corporation dba Handler Homes and Indian Mission Investments, LLC's Mot. to Dismiss Verified Compl. for Prelim. and Permanent Inj., Declaratory J., and Related Relief and to Strike Certain Relief Sought Therein, D.I. 16; Defs. Insight Building Co., LLC, 36 Builders, Inc. dba Insight Homes, and Insight Homes, Inc.'s Mot. to Dismiss, D.I. 23.

[77] First Am. Compl., D.I. 30.  The Plaintiffs then filed an amended motion to expedite claims against the Insight Defendants only.  Pls.' Am. Mot. to Expedited Claims (against Insight Defs. only), D.I. 35.  Insight opposed this motion.  Insight Defs.' Response to Pls.' Am. Mot. for Expedited Proceedings and Trial Date, D.I. 42.  Ultimately, I heard both motions to dismiss at the same time.

13

Dismiss").[78]  The Insight Defendants moved to dismiss the same day (the "Insight Motion to Dismiss").[79]

I heard argument on both motions to dismiss on May 12, 2020.[80]  Based on my partial ruling from the bench, the parties stipulated to dismiss Seven Branch and Cannon Road and to strike the Plaintiffs' request for punitive damages.[81]  I issued an order dismissing those defendants and striking the punitive damages request on May 19, 2020, and I took the remainder of the matter under consideration on that date.

## II. ANALYSIS

The Defendants have moved to dismiss this action under Chancery Court Rule 12(b)(6).  In considering such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[82]

---

[78] Defs.' Handler Corporation DBA Handler Homes, Seven Branch, LLC, Cannon Road Investments, LLC and Indian Mission Investments, LLC's Mot. to Dismiss First Am. Verified Compl. and to Strike Request for Punitive Damages Therein, D.I. 38.

[79] Insight Defs.' Mot. to Dismiss, D.I. 40.

[80] D.I. 60.

[81] Order (a) Dismissing Defs. Seven Branch, LLC and Cannon Road Investments, LLC, with Prejudice, and (b) Striking Demand for Punitive Damages from Am. Compl., D.I. 63.

[82] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotations omitted).

14

However, I do not need to accept "conclusory allegations unsupported by specific fact" as true, nor must I "draw unreasonable inferences" in the Plaintiffs' favor.[83] I may consider facts in documents incorporated into the Amended Complaint.[84]

### A. Defendant Indian Mission's Motion to Dismiss Count IV for Breach of Fiduciary Duty is Granted

In Count IV, the Plaintiffs bring a claim for breach of fiduciary duty against Indian Mission in its role as developer of Stonewater Creek.[85] As noted, the pleadings do not allege that the Plaintiffs purchased their lots directly from Indian Mission or otherwise had a contractual or commercial relationship with Indian Mission.[86] The Plaintiffs, however, allege that "Indian Mission owes a common law fiduciary duty to Plaintiffs" because "Plaintiffs reposed a special trust in and reliance on the judgment of the developer. . ."[87]

Fiduciary relations are special, equitable relationships of trust. Under Delaware law, a fiduciary relationship arises "where one person reposes special trust in and reliance on the judgment of another or where a special duty exists on the part

---

[83] *Thermopylae Capital Partners, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *9 (Del. Ch. Jan. 29, 2016) (quoting *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011)).

[84] *See In re Morton's Rest. Grp., Inc. S'holder Litig.*, 74 A.3d 656, 658–59 (Del. Ch. 2013); *In re Martha Stewart Living Omnimedia, Inc. S'holder Litig.*, 2017 WL 3568089, at *3 (Del. Ch. Aug. 18, 2017).

[85] Am. Compl., ¶¶ 116–20.

[86] *Id.* ¶ 117.

[87] *Id.* ¶ 118.

15

of one person to protect the interests of another."[88] The fact that a relationship involves "trust in the specialized knowledge or skill of one party," however, does not turn it into a fiduciary relationship.[89] Rather, a fiduciary relationship "requires confidence reposed by one side *and* domination and influence exercised by the other."[90] The equitable concept of the fiduciary relationship developed as an incident of the law of trusts. The hallmark of a fiduciary relationship is illustrated by the trustee/beneficiary relationship: for such a relationship to prevail, both parties must have the same end in mind—the good of the beneficiary—and the trustee must pursue this end to the exclusion of any other interests.[91] Because fiduciary relationships thus are straitened by the imposition of special duties, a legal regime imposing broadly such relationships, by definition, would hamstring parties' ability to self-order, with perverse effects on efficiency and the right to contract. Broadly

---

[88] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) (quoting *Metro Ambulance, Inc. v. E. Med. Billing, Inc.*, 1995 WL 409015, at *2 (Del. Ch. July 5, 1995)).

[89] *Prestancia Mgmt. Grp., Inc. v. Virginia Heritage Found., II LLC*, 2005 WL 1364616, *6 n.50 (Del. Ch. May 27, 2005).

[90] *Id.* at *6 (emphasis added) (citing *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 625 (Del. Ch. 2005)).

[91] *Wal-Mart Stores*, 872 A.2d at 626 ("the concept of a fiduciary relationship, which derives from the law of trusts, is more aptly applied in legal relationships where the interests of the fiduciary and the beneficiary incline toward a common goal in which the fiduciary is required to pursue solely the interests of the beneficiary in the property." (quoting *Crosse v. BCBSD, Inc*. 836 A.2d 492, 495 (Del. 2003))), *aff'd in pertinent part* 901 A.2d 106 (Del. 2006).

imposing such relationships would be inimical to commercial affairs, and fiduciary duties are thus narrowly implied, arising only in the conditions described above.[92]

The Plaintiffs cite to Delaware cases in which this Court has found that developers owed fiduciary duties to homeowners.[93] However, in these cases, the developers retained control of (or acted in lieu of) a homeowners association and used this control to extract benefits for themselves.[94] A role on the board or as controller of a homeowners association invokes fiduciary duty because of the ability to exercise "domination and influence" over the homeowners, particularly in the form of imposing rules and extracting assessments, and because, as the controller or director of such board, the goal of any action must be in the interests of the

---

[92] *See id*. at 624–25.

[93] *REDUS Peninsula Millsboro, LLC v. Mayer*, 2014 WL 4261988 (Del. Ch. Aug. 29, 2014); *Phillips v. Yingling*, 1982 WL 149636 (Del. Ch. Apr. 23, 1982).

[94] *See REDUS*, 2014 WL 4261988, at *3 (noting that "[a]s alleged, the developer was the controller of the association which would owe duties to its members, the lot owners, including the Homeowners."); *Phillips*, 1982 WL 149636, at *1 (property owners sued controlling developer to enjoin collection of assessments and require developer to establish a board of directors for the homeowners association). The Plaintiffs also cite to cases outside this jurisdiction to allege that developers generally owe fiduciary duties to lot owners. Although the Plaintiffs find some language generally amenable to their proposition, I find these cases align with the context described above, where the developer maintains a role in the homeowners association. *See Walbeck v. I'On Co., LLC*, 827 S.E.2d 348, 359 (S.C. Ct. App. 2019) (South Carolina Court of Appeals recognizing "the fiduciary duty a developer owes to homeowners as the development's promoter" while also recognizing "that a fiduciary duty arose from the developer's control of the villa owners' association."); *Raven's Cove Townhomes, Inc. v. Knuppe Dev. Co.*, 114 Cal. App. 3d 783, 799 (Ct. App. 1981) (California court stating that "[i]n most jurisdictions, the developer is a fiduciary acting on behalf of unknown persons who will purchase and become members of the association" in the context of a case where "[t]he uncontroverted evidence established that the Developer and its employees (who were the incorporating directors and initial officers) totally controlled the [homeowners'] [a]ssociation").

membership. Such corporate-board involvement is inherently equitable in nature. Here, according to the Amended Complaint, Indian Mission developed Stonewater Creek, including the Stormwater Management Plan for Phase 5.3, then "[t]he lots on which Plaintiffs had their homes constructed all were conveyed to their homebuilder by Indian Mission."[95] The drainage issues here do not involve actions of Indian Mission with respect to any homeowners association at Stonewater Creek.[96]

There is, I suppose, some quantum of trust inherent in every commercial relationship, if indeed such a relationship can be said to have existed between Indian Mission and the Plaintiffs. But that proves too much—equity may not impinge on every such relationship as a result. The duties owed by Indian Mission are imposed by common and statutory law. Indian Mission's interest is as a for-profit land developer, the Plaintiffs' interests were in contracting to purchase, at one remove, residential property developed by Indian Mission. The relationship here was not one of trust, and the ends sought by the parties were not identical. At its heart, as alleged, the relationship was one of ordinary care, and equitable duties do not apply. The facts alleged appear to support a claim in tort for negligence, which the Plaintiffs

---

[95] Am. Compl., ¶¶ 117.

[96] The Plaintiffs' only allegation regarding Indian Mission's involvement with the homeowners association is that one of Handler's principals, Allen, "directly instructs the HOA's president, Rick Goldberg, what to tell Stonewater Creek residents about the drainage crisis there." *Id.* ¶ 32. The Amended Complaint does not allege facts from which I can conclude that Indian Mission controls Goldberg or the homeowners association; more fundamentally, the Amended Complaint does not allege wrongdoing *via* such control.

have alleged in Count V and which Indian Mission has not moved to dismiss. In sum, I cannot reasonably infer from the facts pled that Indian Mission's role as a land developer put it in the position of a fiduciary to the buyers of lots in Stonewater Creek, and I therefore grant the motion to dismiss Count IV of the Amended Complaint.

### B. Defendant Handler's Motion to Dismiss Count VI is Granted

In Count VI, the Plaintiffs seek to "pierce the corporate veil" and hold Handler liable for the actions of its subsidiary, Indian Mission.[97] In other words, the Plaintiffs seek to hold Handler liable for any money damages Indian Mission incurs in this action. Handler is Indian Mission's corporate parent, and the Plaintiffs state no case against Handler other than that assertion. Delaware law presumes respect for the corporate form: "A subsidiary corporation is presumed to be a separate and distinct entity from its parent corporation."[98] Similarities between entities, such as overlap of personnel, do not negate this basic principle: "This rule applies even where one corporation wholly owns another and even though the entities have identical officers and directors."[99] To pierce the corporate veil, a plaintiff must adequately allege facts from which the court may conclude that the subsidiary is "a sham and exist[s] for no

---

[97] *Id.* ¶¶ 128–37.

[98] *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *6 n.44 (Del. Ch. Nov. 13, 2018) (quoting 1 *Fletcher Cyclopedia of the Law of Corporations* § 26, at 82, 84–85).

[99] *Id.*

other purpose than as a vehicle for fraud."[100]  Judicial disregard for the corporate form is not a remedy available to plaintiffs who merely wish to hold another entity liable in addition to the one with whom they contracted.[101]

The Plaintiffs offer two theories to reach through Indian Mission's corporate form and hold Handler liable.

*First*, the Plaintiffs point out that Handler's principals, Mark Handler and Allen, conduct business for Indian Mission, and that in doing so, they use their Handler email accounts.[102]  As noted, overlapping or identical personnel does not by itself warrant ignoring the corporate form.  The bare assertion that personnel use email accounts associated with one entity while conducting the business of another does not indicate fraud and cannot by itself support an allegation that Mark Handler and Allen were using Indian Mission to perpetrate fraud.

*Second*, the Plaintiffs allege that Indian Mission is undercapitalized.[103]  Undercapitalization is a factor courts consider in determining whether an entity is in fact a sham.[104]  Equity will not permit the use of a sham or fraudulent corporation

---

[100] *PR Acquisitions, LLC v. Midland Funding, LLC*, 2018 WL 2041521, *15 (Del. Ch. Apr. 30, 2018) (quoting *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999)).

[101] *Wenske*, 2018 WL 5994971, *5.

[102] Am. Compl., ¶¶ 31–34.

[103] *Id.* ¶ 36.

[104] *See Connecticut Gen. Life Ins. Co. v. Pinkas*, 2011 WL 5222796, at *2 (Del. Ch. Oct. 28, 2011) (noting that undercapitalization is a "shortcoming[] frequently found when the 'veil is pierced'"); *Mason v. Network of Wilmington, Inc.*, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005) (piercing

20

form solely as a vehicle to avoid liability.[105] But the Plaintiffs' assertion on this point is unsupported by adequate factual allegations. The Plaintiffs allege that Indian Mission's assets—*i.e.*, the plots it develops—diminish as it sells those plots to future homeowners.[106] But the proceeds of the sale, in that case, are equivalent assets held by Indian Mission. The Amended Complaint does not allege how this fact makes Indian Mission a vehicle for fraud. The Plaintiffs also point out that while Indian Mission is bonded with respect to drainage deficiencies, those bonds are posted to the Sussex Conservation District and are thus unavailable to homeowners as damages.[107] But the fact that Indian Mission has not created a bond in favor of homeowners, where one is not required by some duty, is not indicative of fraud. These allegations are insufficient to support an allegation that Indian Mission was "[in]adequately capitalized for the corporate undertaking," let alone that the LLC was created as a sham to further fraud.[108]

The Plaintiffs have not alleged facts in the Amended Complaint from which I can infer that Indian Mission has defaulted on its obligations, that it is unable to

---

the veil analysis "include[s] whether the corporation was adequately capitalized for the corporate undertaking. . ." (quoting *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988))).

[105] *See Mason*, 2005 WL 1653954, at *2–4.

[106] Am. Compl., ¶ 36.

[107] *Id.*

[108] *Mason*, 2005 WL 1653954, at *3.

21

operate, that it is a shell entity, or even that it will be unable to satisfy any recovery the Plaintiffs seek. The Plaintiffs' response brief exaggerates the allegations pled in the Amended Complaint on these points. In briefing, the Plaintiffs contend that "[t]he [Amended] Complaint contains the following facts: . . . Indian Mission is . . . unable to pay its creditors," and "Indian Mission is insolvent because it is unable to pay its debts as they become due. . ."[109] But these allegations are not reasonably inferable from the Amended Complaint. The Plaintiffs cite only to paragraph 36 of the Amended Complaint. Paragraph 36 posits the *theory*, described above, of why Indian Mission *could eventually* become insolvent: "with each plot developed and sold, the assets of [Indian Mission] diminish, while the risk of potential liabilities increases."[110] That paragraph contains no factual allegations that Indian Mission has been unable to pay any creditor, that it is insolvent, or that it is unable to pay any debt. Nor does any other part of the Amended Complaint contain such factual allegations in a non-conclusory fashion. Rather, the Plaintiffs' allegation is essentially that Indian Mission is closely tied to its parent company Handler, and that Handler has more money to rectify the Plaintiffs' alleged harm than does Indian Mission. Accepting the Plaintiffs' non-conclusory allegations as true, Indian

---

[109] Pls.' Br. in Opp'n to Mot. by Defs. Handler Corporation DBA Handler Homes, Seven Branch, LLC, Cannon Road Investments, LLC and Indian Mission Investments, LLC to Dismiss First Am. Verified Compl. and to Strike Request for Punitive Damages Therein, D.I. 50 ("Pls.' Indian Mission Answering Br."), at 6–7.

[110] Am. Compl., ¶ 36.

Mission owned the property that is now Stonewater Creek, and has exchanged some of those land assets for cash. From those facts alone, I may not reasonably infer that Indian Mission is a fraudulent or sham entity.

In conclusion, I find that the Plaintiffs' alleged facts do not support a claim that Indian Mission's corporate form should be disregarded in this instance. I therefore grant the motion to dismiss Count VI of the Amended Complaint, which entails dismissing Handler from this Action.

### C. Judgment is Deferred on Counts I-III Related to the Stormwater Management Act and Alias Count X for Fraud against Insight

As noted, the parties stipulated to the dismissal of Seven Branch and Cannon Road from this Action. Above, I have dismissed fiduciary claims against Indian Mission and all claims against Handler. This pares the Amended Complaint to two remaining tranches: (1) claims for equitable and declaratory relief related to the Stormwater Management Act, which both remaining Defendants have moved to dismiss; and (2) tort and contract claims, on which Insight has moved to dismiss the Plaintiffs' claim for fraud only, but which otherwise neither remaining Defendant has moved to dismiss.[111] At this juncture, I conclude that efficiency will be served through deferring judgment on the remainder of the motions to dismiss and giving

---

[111] I note that the Amended Complaint does not seek equitable relief to remedy any common-law ongoing torts, such as nuisance or trespass. Such torts are not alleged here.

23

the parties the opportunity to confer on the best way to proceed, with the guidance offered below.

The Stormwater Management Act provides this Court with statutory jurisdiction to grant injunctive relief in relation to the Act.[112] Here, the Plaintiffs seek two forms of equitable relief: first, Indian Mission should be enjoined from selling any additional lots until the Stonewater Creek Stormwater Management Plan, as implemented, is in compliance with the Act;[113] second, Insight should be enjoined from building any additional homes in Stonewater Creek until compliance occurs.[114]

While the Amended Complaint paints a compelling portrait of the Plaintiffs' need for relief, the injunctive relief actually sought by the Plaintiffs presents difficulties that may obstruct granting the requested relief if the litigation proceeds, during which I would require further briefing assistance from the parties. As the Plaintiffs concede, remediation efforts, if slow, are ongoing.[115] That process is being

---

[112] 7 *Del. C.* § 4016 ("any aggrieved person who suffers damage or is likely to suffer damage because of a violation or threatened violation of this chapter may apply to the Chancery Court for injunctive relief. Among any other appropriate forms of relief, the Chancery Court may direct the violator to restore the affected land or water impacted area to its original condition.").

[113] Am. Compl., ¶ 97.

[114] *Id.* ¶ 105. The Plaintiffs also contend that I should issue a declaratory judgment under 10 *Del. C.* § 6501 "that Indian Mission and Insight (a) have failed to but (b) are required to comply and (c) must be compelled to comply with the Stormwater Management Act and Stormwater Management Plan." *Id.* ¶ 113. It is a mystery why declaratory relief is necessary in this action seeking also injunctive relief and damages, but in any event declaratory relief is available at law or in Chancery, and the presence of a claim for such relief is irrelevant to the calculous I have limned, below.

[115] *See* Pls.' Indian Mission Answering Br., at 9–11.

24

monitored by the Sussex Conservation District.[116] The Plaintiffs essentially argue that the Sussex Conservation District has inadequate enforcement mechanisms, and that the heat of an injunction is necessary to light a fire under the Defendants' feet. But enjoining ongoing violation of a technical statute presents oversight issues: the Court would have to determine when the Defendants have achieved compliance (and thus when to lift the injunctive relief), but, as the Plaintiffs describe it, "[a] stormwater management plan is a complex compilation of engineering data and calculations: plats, graphs, and land use specifications . . . topography, stormwater easements, pipe and swale profiles, manhole flow patterns, and trench details for unpaved areas."[117]

It is not clear how this Court's oversight and coercion via the relief sought could, as a practical matter, be achieved. Such relief, it appears, would also be intrusive on the Sussex Conservation District's ongoing (though allegedly dilatory) oversight. The ongoing remediation raises issues of the ripeness of any request to apply equitable relief. Moreover, some of the Plaintiffs' requested relief—enjoining Insight from building further homes—appears duplicative of the power the Sussex Conservation District already wields, and in fact has applied here. The relief sought may also interfere with existing Insight sales or construction contracts, which raises

---

[116] *Id.* at 11–13.

[117] Am. Compl., ¶ 51.

questions of the necessity of those counterparties as parties here. Put simply, the Plaintiffs are not asking for an injunction that the Defendants comply with the Act with respect to their lots, by, for instance, "restor[ing] the [lots] to [their] original condition."[118] Instead, they ask me to become involved in implementation of a development-wide drainage plan currently under the remediation efforts of the County. It is unclear at this stage of the proceedings if equity should, or as a practical matter can, so act. Equity is, of course, practical and flexible; nothing herein should be read to say that, if the facts ultimately so warrant, no relief in equity will be available.

The issues identified above are not rulings on the motions to dismiss at issue here, but I offer them as potential guidance as to what issues may arise if the litigation proceeds. Aside from the relief related to the Stormwater Management Act, the Plaintiffs' remaining claims are legal: negligence, breach of contract, breach of implied warranties, negligent construction, and fraud. Insight has moved to dismiss the claim for fraud; otherwise, the Defendants have not moved to dismiss these claims. While I struck the Plaintiffs' request for punitive damages in this Court, I did so without prejudice to the Plaintiffs' ability to revive such a request in a court of law, where such damages are properly entertained.[119]

---

[118] 7 *Del. C.* § 4016.

[119] *See* D.I. 63.

26

If I go forward to evaluate the Plaintiffs' claims and—should I find them proved—consider injunctive relief, I will retain this matter under "clean-up" jurisdiction and resolve the legal claims regardless of whether equity is ultimately invoked.[120] If the Plaintiffs do not pursue the equitable claims, this matter belongs in the Superior Court. I find it appropriate to defer judgment on the Motions to Dismiss Counts I-III related to the Stormwater Management Act and alias Count X for fraud. The parties should confer, and the Plaintiffs should inform me within two weeks, given the course of litigation and the partial resolution of the motions described in this Memorandum Opinion, whether they wish to pursue this litigation in equity and have me resolve the remainder of the motions to dismiss, or if they are willing to forgo injunctive relief and elect to transfer the remaining claims to the Delaware Superior Court, where full relief for legal claims as well as punitive damages are available.

## III. CONCLUSION

Based on the foregoing, Count VI of the Amended Complaint is dismissed, and Defendant Handler is thereby dismissed from this Action. Count IV of the

---

[120] *See Medek v. Medek*, 2008 WL 4261017, at *3 (Del. Ch. Sept. 10, 2008) ("Once the Court determines that equitable relief is warranted, even if subsequent events moot all equitable causes of action or if the court ultimately determines that equitable relief is not warranted, the court retains the power to decide the legal features of the claim pursuant to the cleanup doctrine." (quoting *Prestancia Mgmt. Grp. v. Va. Heritage Found., II LLC*, 2005 WL 1364616, at *11 (Del. Ch. May 27, 2005))).

Amended Complaint for breach of fiduciary duty against Indian Mission is dismissed. Judgment on the motions to dismiss Counts I-III against Indian Mission and Insight, as well as judgment on the motion to dismiss alias Count X against Insight is deferred. The Plaintiffs should inform me within two weeks whether they wish to proceed in equity and desire resolution of the remainder of the motions to dismiss or if they wish to transfer this Action. The parties should also submit an appropriate form of order consistent with the partial rulings in this Memorandum Opinion.